United States District Court
Southern District of Texas
**ENTERED**
April 23, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOE ROBLES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:15-CV-495 |
| | § | |
| ARANSAS COUNTY SHERIFF'S DEPARTMENT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Defendant Matthew Campbell, a deputy with the Aransas County Sheriff's Department, has moved for summary judgment on claims that Plaintiffs Joe and Elvira Robles have asserted against him under 42 U.S.C. § 1983. For the reasons set forth below, Deputy Campbell's motion (D.E. 55) is **GRANTED**.

### FACTS

This case arises from police intervention into a landlord/tenant dispute. The Court previously described the facts in its order (D.E. 25) on the first motion to dismiss filed in this case, which the Court hereby incorporates by reference. The sole remaining claims arise under (1) the Fourth Amendment, based on Deputy Campbell's use of force in arresting Mr. Robles; and (2) the First Amendment, based on Deputy Campbell's allegedly retaliatory (a) threat that he would jail Plaintiffs should further law enforcement intervention be required, and (b) arrest of Mr. Robles.

# DISCUSSION

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute of material fact means that 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Evidence must be viewed, and all justifiable inferences drawn, in favor of the party opposing the motion. *Anderson*, 477 U.S. at 255.

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, the nonmoving party cannot avoid summary judgment by "rest[ing] on mere conclusory allegations or denials in its pleadings." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)) (internal quotation mark omitted). Nor must the Court "sift through the record in search of evidence to support" the nonmoving party's claim. *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)) (internal quotation marks omitted). Instead, the nonmoving party must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim." *Id*. (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) (internal quotation marks omitted). "After the nonmovant has been given an opportunity to raise a genuine factual

issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

As regarding the standard of review, Plaintiffs suggest that summary judgment is improper whenever there are any points of disputed credibility. *See* D.E. 61, pp. 6–7. This formulation sweeps too broadly, as on summary judgment the Court is concerned only with disputed issues of **material** fact. *See* Fed. R. Civ. P. 56(a). "[D]ispute as to an immaterial fact does not preclude summary judgment." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 10A FED. PRAC. & PROC. § 2725.1 (4th ed.). Likewise, "[u]nsupported allegations that credibility is in issue will not suffice" to get Plaintiffs' claims to the jury. *Id.* at § 2726.

The fact that there is video of the December 31, 2013 incident also affects the standard of review. In such cases, the Court may "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)) (internal quotation mark omitted). "When one party's description of the facts is discredited by the record, we need not take his word for it but should view 'the facts in the light depicted by the videotape.'" *Id*. (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

### A. Qualified Immunity

Deputy Campbell has asserted the defense of qualified immunity, which "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) (citations and quotation marks omitted), *cert. denied*, 137 S. Ct. 1121 (2017).

On a Rule 56 motion such as this one, qualified immunity "alters the usual summary judgment burden of proof." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)) (internal quotation mark omitted). After an official has asserted the defense of qualified immunity, the burden is on the plaintiff to "rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id*.

There are two steps to a qualified immunity analysis. First, the Court must consider whether the alleged facts establish a constitutional violation. *Id*. Second, the Court must determine "whether the defendant's actions violated clearly established constitutional rights of which a reasonable person would have known." *Id*. Deputy Campbell's qualified immunity defense applies to Plaintiffs' claims under both the First and Fourth Amendments. *Id*; *see also Howell v. Town of Ball*, 827 F.3d 515, 525 (5th Cir. 2016) (government officials entitled to qualified immunity from First Amendment claim), *cert. denied sub nom. Town of Ball, La. v. Howell*, 137 S. Ct. 815 (2017).

### B. Excessive Force Claim

#### 1. Deputy Campbell Is Entitled to Qualified Immunity

Mr. Robles's excessive force claim arises from Deputy Campbell's use of force to arrest him. He contends that he "<u>complied</u> with Campbell's voice commands and presented no resistance or threat to Campbell or anyone else," and as such, "[a]<u>ny</u> use of force is unreasonable and excessive force." D.E. 61, p. 18 (emphasis in original).

The video recording says otherwise. *See Poole v. City of Shreveport*, 691 F.3d 624, 631 (5th Cir. 2012) (court need not credit plaintiff's "assertion that he did not actively resist the officers' commands, an assertion which is plainly contradicted by the videotape"). Deputy Campbell ordered Mr. Robles six times to turn around and face away from him, but despite having a gun trained on him, Mr. Robles did not comply. Instead, he took several steps toward Deputy Campbell and told him to "stop hollering at me." Under such circumstances, a reasonable officer in Deputy Campbell's position would have considered it appropriate to employ "measured and ascending" levels of force. *Id.* at 629 (quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010)) (internal quotation marks omitted).

Mr. Robles focuses particularly on Deputy Campbell's use of force in bringing him to the ground. *See* D.E. 61, p. 8. In *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016), the Fifth Circuit considered qualified immunity in the context of an excessive force claim based on a "takedown" incident to an arrest, similar to what Mr. Robles alleges. In *Griggs*, the Fifth Circuit held that "our precedent does not clearly establish that [a]

'takedown' maneuver—against a drunken, erratic suspect who is resisting arrest—is constitutionally unreasonable." *Id.* at 314.

*Griggs* decides this case. There is no suggestion that Mr. Robles was drinking on the date in question, but his behavior could be characterized as erratic. As for noncompliant behavior, the *Griggs* suspect's resistance—"lurch[ing]" to the side and saying "no, no" after the officer told him to put his hands behind his back to be handcuffed, *id.* at 313—might be viewed as slightly more noncompliant than Mr. Robles's, but not to a meaningful degree, as Mr. Robles disregarded repeated instructions from Deputy Campbell and was not handcuffed or otherwise restrained when Deputy Campbell brought him to the ground. The amount of resistance that justifies a use of force varies with context, and "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As such, reasonableness must be considered "from the perspective of a reasonable officer on the scene, rather than with 'the 20/20 vision of hindsight.'" *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

Here, the circumstances of Mr. Robles's arrest likely would have appeared more dangerous to the average police officer than those faced by the officer in *Griggs*. Mr. Robles's takedown occurred after Deputy Campbell responded to a report of a violent altercation, as opposed to a traffic stop of an intoxicated driver. Deputy Campbell also arrested Mr. Robles in an unfamiliar residence where other individuals might have been

present and tried to intervene, whereas the arresting officer in *Griggs* was on the roadside with the suspect. In *Griggs*, the takedown occurred fifteen minutes into the stop, after the arresting officer had already frisked the suspect and determined he did not have a weapon. Deputy Campbell was unable to take such precautions until after Mr. Robles was already secured and under arrest.

Deputy Campbell also appears to have used less force than was present in *Griggs*. The *Griggs* panel, which also had the benefit of a video recording of the incident, described the officer as having "placed Griggs in a choke hold, swept his legs out from under him, and body slammed him onto the nearby grass." 841 F.3d at 313. By contrast, Deputy Campbell brought Mr. Robles to the ground in a way that posed less risk of injury and thus was commensurate with the amount of resistance he encountered.[1] Absent any evidence that he violated clearly established law, and Mr. Robles has provided none, Deputy Campbell is entitled to qualified immunity.

### 2. Mr. Robles's Contentions

Mr. Robles relies primarily on *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018), a case arising from the execution of a no-knock warrant at a residence that the police suspected was being used for drug trafficking. Although video evidence showed that Darden raised his hands in the air when the team of officers entered, the officers "allegedly threw him to the ground, tased him twice, choked him, punched and

---

[1] Mr. Robles also testified that Deputy Campbell "[fell] on my back with his knees . . . two or three times right in the center of my back." D.E. 61, p. 9. To the extent Deputy Campbell's knees did make contact with Mr. Robles's back, such contact must have been brief, as Deputy Campbell was in bodily contact with Mr. Robles only for about thirty seconds. The Court also finds it significant that at no point during or immediately after the arrest did Mr. Robles ever express any physical discomfort or complain about the level of force Deputy Campbell deployed. Instead, as captured by the video recording, his chief grievance at the time was that Deputy Campbell falsely accused him of having a knife. *See* D.E. 61, pp. 8, 9.

kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him." *Id.* at 725, 730. Such treatment caused Darden to suffer a fatal heart attack during the course of the arrest. *Id.* at 725. *Darden* is readily distinguishable because the officers in that case used significantly greater levels of force against an arrestee who at least in some respects was more compliant than Mr. Robles.

The rest of Mr. Robles's response as regarding his Fourth Amendment claim boils down to immaterial credibility disputes. For instance, he strenuously contests the allegations made by non-party Andrea LaRue, a former tenant of Plaintiffs', during the 911 call that prompted Deputy Campbell's December 31 trip to Plaintiffs' property. *See* D.E. 61, p. 14. In a recording of that call, which was provided to the Court, LaRue can be heard arguing with a man as she asks for police assistance; she then screams and tells the dispatcher that Mr. Robles had just tried to shove her over an interior balcony. Based on his chronological analysis of the 911 call, Mr. Robles charges that LaRue's accusations are "a false report" as seen by the "implausibility" of her assumed timeline.[2] *Id.* at 13, 14.

However, the truth or falsity of LaRue's allegations "is not the proper inquiry . . . . A court must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily against the historical facts." *Griggs*, 841 F.3d at 313

---

[2] Mr. Robles has other criticisms of LaRue's conduct that day. For instance, he asks why, if LaRue was so afraid of Mr. Robles, didn't she have her six-foot, two-hundred-sixty-pound nephew, who was helping her move, right beside her at all times? *See* D.E. 61, p. 14. Similarly, wasn't LaRue really the one to blame, given that she used profanity and made a rude remark about Mr. Robles's son, as heard on the 911 recording? *Id.* at 14–15. Also, could the incident have been that serious if LaRue came away with at most only minor injuries? *Id.* at 11. Mr. Robles claims these are credibility issues that preclude summary judgment. *See id.* at 14. However, these "issues" are irrelevant to how a reasonable police officer would have responded to the disturbance at hand and thus immaterial.

(emphasis in original). As soon as Deputy Campbell walked inside, LaRue called to him in a tearful, distraught voice that Mr. Robles had tried to push her over the railing. Any reasonable officer under similar circumstances would have understood the incident as potentially involving a serious crime.[3]

Mr. Robles also claims that his challenges to Deputy Campbell's credibility make summary judgment improper. For instance, he notes that Deputy Campbell repeatedly shouted at him to take his hands out of his pockets, when they clearly were not in his pockets, and likewise ordered him to stop resisting, even though the video appears to show him lying passively as he is handcuffed. D.E. 61, pp. 8–9.

Deputy Campbell's conduct is not above reproach.[4] But for purposes of the pending motion, Mr. Robles's claim that Deputy Campbell is not a credible witness is immaterial because the entirety of the allegedly unconstitutional use of force was caught on video. The Court need not rely on Deputy Campbell's testimony to assess the reasonableness of the force he used.

In sum, Deputy Campbell's actions "may not have been as restrained as we would like to expect from model police conduct, but qualified immunity 'protect[s] officers

---

[3] Mr. Robles also protests that Deputy Campbell displayed "improper partiality . . . in Ms. Larue's favor," as seen by the video recording of their friendly conversation after Mr. Robles was under arrest. D.E. 61, p. 11. Whatever Deputy Campbell thought of LaRue and Mr. Robles is irrelevant for purposes of assessing his conduct against that of a reasonable officer. *See Poole*, 691 F.3d at 629 (plaintiff's suggestion that defendant officer "desire[d] to avenge a personal insult . . . makes no difference when viewed against the backdrop of his broader interaction with the two officers"). As for Mr. Robles's claim that "defendant Campbell and Ms. Larue made and executed a plan to create a false 911 record to justify the arrest of Mr. Robles," D.E. 61, p. 12, he offers no evidence in support.

[4] Mr. Robles proffers the testimony of Roger Clark, who is reportedly an expert in police procedure. Mr. Clark opined that it was "not necessary or appropriate" for Deputy Campbell to display his gun or to take Mr. Robles to the ground in the process of arresting him. D.E. 62-7, pp. 6–7 (Roger Clark Dep.). Even so, such testimony falls short of establishing that any reasonable police officer would recognize Deputy Campbell as having used excessive force, as necessary to overcome his qualified immunity defense.

from the sometimes hazy border between excessive and acceptable force.'" *Griggs*, 841 F.3d at 315 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Mr. Robles has failed to identify any fact issue as to whether Deputy Campbell's use of force violated clearly established law. For these reasons, the Court **GRANTS** Deputy Campbell's motion for summary judgment on Mr. Robles's Fourth Amendment claim.

### C. First Amendment Claims

Plaintiffs' First Amendment claims arise from Mr. Robles's December 25, 2013 complaint to Deputy Campbell that LaRue had stolen his property. Plaintiffs allege that due to this complaint, Deputy Campbell retaliated against them by (1) threatening to arrest them in the event that further law enforcement intervention was necessary, thereby chilling their exercise of their right to petition the government in case of future incidents;[5] and (2) actually arresting Mr. Robles during the December 31 incident.

### 1. Chilling Right to Petition

For private citizens such as Plaintiffs to establish a First Amendment retaliation claim, they must show that "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir.

---

[5] There is a dispute, though not a material one, as to whether Deputy Campbell said that if he was called back to the property, he would arrest "all three" of Mr. Robles, Mrs. Robles, and LaRue, or only Mr. and Mrs. Robles. In a declaration, Mr. Robles calls the former characterization "untrue" and says that "Campbell only threatened myself and my wife." D.E. 62-1, p. 3.

2002). The inquiry is an objective one, as "some retaliatory actions—even if they actually have the effect of chilling the plaintiff's speech—are too trivial or minor to be actionable as a violation of the First Amendment." *Id*.; *see also Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("The focus . . . is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled.").

Here, there is no dispute that making complaints to law enforcement is a constitutionally protected activity. The first question for the Court, then, is whether Deputy Campbell's statement on December 25—"If I'm called back again here, I'm going to put you all in jail, even your wife," as Mrs. Robles described it—caused Plaintiffs to suffer an injury that would chill a person of ordinary firmness from making further reports to the police.

The Court holds that there is insufficient evidence of a chilling effect for Plaintiffs' claims to proceed. The only evidence Plaintiffs cite on this point is a statement that Mr. Robles made after his arrest, when one of the officers present asked him why he hadn't called the police if he was concerned that LaRue was stealing his things. Mr. Robles answered that he couldn't call the police because Deputy Campbell had previously told him that he would be arrested if the police had to come back to his property.[6]

This evidence does not create an issue of material fact as regarding the chilling effect of Deputy Campbell's statement. The clear import of Deputy Campbell's warning was that the police should be summoned only when necessary. To the extent Mr. Robles

---

[6] Plaintiffs point to no evidence that Deputy Campbell's statement had a chilling effect on Mrs. Robles, though she indisputably heard Deputy Campbell's statement and joins this claim against him.

truly believed that any future call to law enforcement, no matter how justified, would result in his arrest, this was an idiosyncratic, unreasonably literal interpretation of Deputy Campbell's words and is insufficient to raise a disputed factual issue as to whether a constitutional violation took place.[7] *Cf. Keenan*, 290 F.3d at 259 n.5 ("Courts have not been reluctant to grant summary judgment for hollow or trivial threats of retaliation." (citations omitted)).

Deputy Campbell is also entitled to qualified immunity on this claim. Plaintiffs have not identified any case holding that a warning such as Deputy Campbell's unconstitutionally chills First Amendment rights, so his statement could not have been contrary to clearly established law. Plaintiffs instead cite testimony in which Deputy Campbell agreed that "making criminal complaints [is] an example of the right of free speech." D.E. 61, p. 19. Based on that testimony, Plaintiffs conclude that Deputy Campbell engaged in "unreasonable conduct that does not meet threshold requirements for qualified immunity." *Id.*

Another officer might have responded differently to the December 25 dispute, but qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" as they exercise their responsibilities. *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation marks omitted). Deputy Campbell's statement, which he characterizes as an effort to defuse the situation, fits within that

---

[7] Moreover, a First Amendment retaliation claim such as Plaintiffs' "requires some showing that the plaintiff's exercise of free speech has been curtailed." *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017) (quoting *Keenan*, 290 F.3d at 259), *cert. denied*, 138 S. Ct. 739 (2018). Not only have Plaintiffs failed to show that their right to petition the government was curtailed, in fact, Plaintiffs appear to concede that Mrs. Robles called 911 after the allegedly chilling threat from December 25. *See* D.E. 61, p. 11.

breathing room. The record indicates that, as of December 25, 2013, Deputy Campbell had already been summoned to Plaintiffs' property twice in the space of a week over relatively minor disputes that required no police action beyond whatever informal mediation he had already provided.[8] LaRue also testified that she told Deputy Campbell that day, during a fifteen-minute conversation out of the hearing of Mr. and Mrs. Robles, that she would be moving out soon. *See* D.E. 62-4, pp. 12–13 (Andrea LaRue Dep.). Deputy Campbell reasonably could have thought his warning would induce Mr. Robles to take a more conciliatory tone with LaRue for the next week until she moved out and the problem resolved itself. His conduct therefore did not violate clearly established law.

### 2. Retaliatory Arrest

Finally, the retaliatory arrest claim may be dealt with summarily. "[E]ven where a citizen believes that he has been subject to a retaliatory detention or arrest, if there was reasonable suspicion or probable cause for an officer to seize the citizen, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'" *Allen v. Cisneros*, 815 F.3d 239, 244–45 (5th Cir. 2016) (quoting *Keenan*, 290 F.3d at 261–62).

---

[8] As was required by the applicable standard of review, the Court's prior order accepted as true the representation in Plaintiffs' complaint that December 25, 2013 was the first relevant occasion that Deputy Campbell had reported to a disturbance at Plaintiffs' property.

The record now indicates that Deputy Campbell also responded to an incident on Plaintiffs' property on December 21, 2013. Deputy Campbell submits, and Mr. Robles disputes, that the complainant in this instance was LaRue. Deputy Campbell's position finds support in a document memorializing a 911 call from that date, which (1) indicates that the caller, identified only as "Andrea," said that her landlord was threatening her; and (2) includes as a contact number for the complainant a phone number that other 911 records suggest belongs to LaRue. *See* D.E. 55-10; D.E. 55-4. LaRue also testified that she had called the police about Mr. Robles in December 2013 before the Christmas Day incident. D.E. 62-4, p. 19 (Andrea LaRue Dep.). Mr. Robles, for his part, swore to his recollection that the December 21 call came from a different former tenant, whose name is Andra, after he told her to move out because she had violated the no-pet provision in her rental agreement. D.E. 62-1, p. 3 (Joe Robles Dec.). Mr. Robles's declaration does not dispute, however, that one of his tenants called 911 on that date or that Deputy Campbell was the officer dispatched to his property. Nor does he address the tenant's allegation that he had threatened her.

Deputy Campbell is entitled to qualified immunity "unless there was no actual probable cause for the arrest and [he was] objectively unreasonable in believing there was probable cause for the arrest." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391 (5th Cir. 2017), *as revised* (Mar. 31, 2017).

The Court previously held that a reasonable officer would have believed that probable cause existed for Mr. Robles's arrest, a conclusion that Plaintiffs' own expert seems not to dispute. D.E. 25, p. 11; *see also* D.E. 62-7, p. 12 (Roger Clark Dep.). Therefore, Deputy Campbell is entitled to qualified immunity on Mr. Robles's retaliatory arrest claim.

Plaintiffs have failed to identify any material issue of fact as regarding their claims under the First Amendment. The Court **GRANTS** Deputy Campbell's motion.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Deputy Campbell's motion for summary judgment and **DISMISSES** Plaintiffs' claims with prejudice.

ORDERED this 23rd day of April, 2018.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE